UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FRANK D'AGOSTINO, on behalf of himself and all others similarly situated | : | 3:07-cv-00161 (CFD) |
| Plaintiff | : | |
| v. | : | |
| | : | |
| WFS FINANCIAL, INC. | : | |
| Defendant | : | MAY 29, 2007 |

## MEMORANDUM OF LAW IN
## OPPOSITION TO MOTION TO DISMISS

**I.  INTRODUCTION**

The plaintiff, Frank D'Agostino, on behalf of himself and all others similarly situated, submits the following Memorandum in Opposition to the Motion to Dismiss filed by the Defendant, WFS Financial, Inc. ("WFS"). In its motion, WFS contends that the National Bank Act ("NBA")[1], which was enacted during the Civil War, preempts the application of Article Nine of the Uniform Commercial Code ("UCC")[2], originally proposed in 1952[3] and enacted in Connecticut in 1959[4], to national banks and their operating subsidiaries. It makes this remarkable contention in the face of thousands of reported decisions by state and federal courts applying the UCC to national banks, and it has not cited a single decision by any court that has preempted the UCC or other state laws governing repossessions such as the Connecticut Retail Installment Sales Finance Act, Conn. Gen. Stat. § 36a-785 ("RISFA").

---
[1] 12 U.S.C. § 1 *et seq.*
[2] Conn. Gen. Stat. § 42a-9-101 *et seq.*
[3] UNIFORM COMMERCIAL CODE, Text and Comments, Nat'l Conf. of Commissioners of Uniform State Laws and American Law Institute (1952).
[4] P.A. 133, S. 9-101; P.A. 01-132, S.1

WFS relies upon a regulation promulgated in 2004 by the Office of the Comptroller of the Currency ("OCC") and codified at 12 C.F.R § 7.4008. This regulation, however, was undertaken absent any Congressional authorization for the expansion of preemption, and it conflicts with well-established Supreme Court precedent that state statutes are preempted only when they have a significant impact upon national banks. Moreover, the language of the regulation does not extend to the UCC or RISFA, and these statutes in no way conflict with any federal law, because neither the National Bank Act nor any OCC regulation address secured transactions or disposition of collateral. Finally, the OCC itself disagrees with WFS's position, having opined that the UCC is not preempted by the regulation. Accordingly, the motion to dismiss should be denied.

## II. OVERVIEW OF THE COMPLAINT AND THE CLASS CLAIMS

Plaintiff brought this suit on behalf of himself and a class of similarly situated individuals who entered into retail installment sales contracts for the purchase of motor vehicles with Connecticut auto dealerships. The auto dealerships assigned the retail installment sales contracts to WFS, who then became the creditor. The complaint alleges that WFS failed to comply with the requirements of the UCC and RISFA in terms of the notices that it provided to Plaintiff and the class members and its manner of calculating the post-disposition deficiencies owed by them.

## IV. ARGUMENT

### A. The Standard for a Motion to Dismiss

The function of a motion to dismiss pursuant to Rule 12(b) (6) for failure to state a claim is "merely to assess the legal feasibility of a complaint, not to assay the weight of

evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 776 (2d Cir. 1984) (citation omitted). Therefore, when considering such a motion, the court must accept the facts alleged in the complaint as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Dismissal of a complaint under Rule 12(b) (6) is inappropriate unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *I. Meyer Pincus & Associates v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991); *see also Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996) (Courts should not grant a Rule 12(b) (6) motion to dismiss merely because recovery seems unlikely or remote, as "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.").

### B. Federal Preemption Does Not Apply

Congress has enacted no law immunizing national bank subsidiaries from compliance with the UCC or other state laws regulating the repossession and disposition of motor vehicles. Nor has it authorized the OCC to preempt such state laws whenever it concludes that it interferes with national bank activities. Finally, the OCC's regulation at issue does not preempt the statutes at issue, as the OCC itself has acknowledged with respect to the UCC claim.

#### 1. The standards for preemption.

Federal preemption of state laws may occur in one of three ways: (1) when Congress explicitly preempts state law in a statute's language (express preemption); (2) when federal legislation has fully occupied a subject matter field (field preemption); or (3)

3

when there is a conflict between federal and state law (conflict preemption). *See e.g., Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000).

The Supreme Court recently held that a national bank's mortgage business, whether conducted by the bank itself, or through an operating subsidiary, was subject to OCC superintendence and that a Michigan statute requiring licensing, reporting, or visitorial regimes was preempted. *Watters v. Wachovia Bank, N.A.,* 127 S. Ct. 1559, 167 L. Ed. 2d 38 (2007). That decision, however, was limited to the national bank's challenge to a state's efforts to oversee and regulate the operating subsidiary. The Supreme Court affirmed in *Watters* that the NBA does not preempt the field such that no state laws can impact national banks or their operating subsidiaries:

> In the years since the NBA's enactment, we have repeatedly made clear that federal control shields national banking from unduly burdensome and duplicative state regulation. Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA. For example, state usury laws govern the maximum rate of interest national banks can charge on loans, contracts made by national banks are governed and construed by State laws, and national banks acquisition and transfer of property are based on State law.

*Id.* at 1567, 167 L. Ed. 2d at 400 (internal citations and quotations omitted). Indeed, the Supreme Court has long held that national banks:

> Are only exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions by which they are designed to serve that government . . . They are subject to the laws of the State, and are governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State law. It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional.

4

*National Bank v. Commonwealth,* 76 U.S. 353, 19 *L. Ed.* 701 (1870); *see also Barnett Bank of Marion City, N.A. v. Nelson,* 517 U.S. 25, 33, 116 S. Ct. 1103, 134 L. Ed. 2d 237 (1996) ("In defining the pre-emptive scope of statutes and regulations granting a power to national banks, these cases take the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted. To say this is not to deprive States of the power to regulate national banks, where . . . doing so does not prevent or significantly interfere with the national bank's exercise of its powers."); *Anderson Nat. Bank v. Luckett,* 321 U.S. 233, 248, 64 S Ct. 599, 88 L. Ed. 692 (1944) ("National banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions"); *Davis v. Elmira Savings Bank*, 161 U.S. 275, 290, 16 S. Ct. 502, 40 L. Ed. 700 (1896) ("Nothing, of course, in this opinion is intended to deny the operation of general and undiscriminating state laws on the contracts of national banks, so long as such laws do not conflict with the letter or the general objects and purposes of Congressional legislation").

The Supreme Court cases establish "a rule and an exception, the rule being the operation of general state laws upon the dealings and contracts of national banks, the exception being the cessation of the operation of such laws whenever they expressly conflict with the laws of the United States or frustrate the purpose for which the national banks were created, or impair their efficiency to discharge the duties imposed upon them by the laws of the United States." *McClellan v. Chipman*, 164 U.S. 347, 357, 17 S. Ct. 85, 41 L. Ed. 461 (1896).

It is therefore clear from more than 100 years of jurisprudence that the NBA does not exempt the entire field of state laws as may apply to national banks. Additionally, no federal laws conflict with the requirements of RISFA or the UCC, as neither Congress nor the OCC have undertaken to regulate the means by which national banks can enforce their security interests, retake or dispose of collateral, or pursue deficiencies. Consequently, no conflict preemption exists. To the extent that this case raises any question of federal preemption, that question concerns express preemption.

### 2. The OCC's purported preemption regulation.

Nothing within the NBA or any other statute expressly preempts the applicability of state repossession laws to national banks. Nor does the NBA or any other act of Congress empower the OCC to preempt state consumer protection laws such as the ones at issue in this case. Nevertheless, in 2004, the OCC adopted a broad regulation that purports to preempt certain state laws in the areas of non-mortgage lending, declaring that state laws are preempted if they "obstruct, impair, or condition a national bank's ability to fully exercise" its powers, either directly or through operating subsidiaries." 12 C.F.R. § 7.4008(d) (attached). Essentially, the regulation provides that no state law applies to national banks unless the state law has only an "incidental" effect on the business of banking. 12 C.F.R. § 7.4008(e). [5]

As a threshold matter, it remains to be determined whether the OCC is empowered to preempt state laws absent express authorization from Congress. Preemption of state laws is not an area that administrative agencies have particular experience or familiarity such that courts would be expected to defer to them. Indeed, the regulation sets forth a *de minimus* standard that appears to conflict with Supreme Court

---

[5] As shown below, this regulation does not apply to the UCC or the repossession provisions of RISFA.

precedent that only significant impairments would result in preemption. *See e.g., Barnett Bank¸* 517 U.S. at 31 (In defining the pre-emptive scope of statutes and regulations granting a power to national banks these cases take the view that normally Congress would not want States to impair . . . **significantly,** the exercise of a power that Congress explicitly granted. To say this is not to deprive States of the power to regulate national banks, where . . . doing so does not prevent or **significantly** interfere with the national bank's exercise of its powers.") (Emphasis added).

This standard requiring significant impairment was endorsed and expanded by Congress in the course of enacting the Riegle-Neal Act, in which Congress instructed the OCC and courts to avoid finding conflicts between federal and state law where possible. H.R. Rep. Conf. Rep. No. 103-651 at 53 (1994), reprinted at 994 U.S.C.C.A.N. 2068 ("Riegle-Neal Conf. Rep."); *see Watters,* dissenting opinion, 127 S.Ct. at 1583, n 22 (Riegle-Neal Act requires the OCC to jump through the additional procedural hoops before "concluding that Federal law preempts the application to a national bank of any State law regarding community reinvestment, consumer protection, fair lending, or the establishment of intrastate branches," but granted no preemption authority to the OCC). Though Riegle-Neal as a whole expanded bank powers by permitting both state and national banks to establish branches and sister banks across state lines, the conference report accompanying the Act stated that Congress did not intend to weaken a state's authority to protect the interests of its consumers or to change the substantive theories of preemption that existed in law at that time. Riegle-Neal Conf. Rep. at 53, 55. The conference report directly instructed the Comptroller to refrain from concluding that a state law is preempted unless "the legal basis is compelling and the Federal policy

interest is clear." *Id. at 55.* Moreover, Congress recently expressly approved of the *Barnett* standard when it enacted the Gramm-Leach-Bliley Act in 1999. 15 U.S.C. § 16701(d) (2) (A) ("In accordance with the legal standards set forth in [Barnett], no State may . . . significantly interfere with the ability of a depository institution or an affiliate thereof . . ."). Although neither the Riegle-Neal Act nor Gramm-Leach-Bliley address the issues raised by WFS in its motion, these acts demonstrate Congressional adherence to the *Barnett* standard of preemption, and, when coupled with the lack of an authorization to expand preemption, cast considerable doubt upon the propriety of the OCC's decision to issue 12 C.F.R. 7.4008(d).

In *Watters,* the Commissioner of the Michigan Office of Insurance and Financial Services made precisely that argument, i.e., that the OCC lacked authority to preempt state law. The Supreme Court declined to answer this question, because it had determined that the NBA itself preempted Michigan's requirement that the operating subsidiary be licensed with the state. *See Watters,* 127 S. Ct. at 1569, 167 L. Ed. 2d at 406, n. 13. Justice Stevens, in a dissent joined by Chief Justice Roberts and Justice Scalia, did address that question in light of their differing view of the NBA. In the dissenting opinion, he wrote that the OCC lacked the "power to immunize banks or their subsidiaries from state laws regulating the conduct of their competitors." 127 S. Ct. at 1583, 167 L. Ed. 2d at 417-418. Justice Stevens wrote in his dissent that "when an agency purports to decide the scope of federal preemption, a healthy respect for state sovereignty calls for something less than *Chevron* deference." *Id.* at 1584, 167 L. Ed. 2d at 419.

The three dissenting justices were the only ones to express any view on the legitimacy of the OCC's attempt to preempt state law; the majority expressly declined to respond to this argument. It remains very much an open question whether §7.0008 effectively preempts any state laws, and the dissenting opinion in *Watters* represents the best available judicial analysis of this question.[6] In the event that the regulation is not valid, then the substantial impairment standard under *Barnett* would apply. No court has ever found that statutes such as these significantly impair a national bank's exercise of its powers, and WFS does not argue that it does.

As will be shown below, even if § 7.0008 and its *de minimus* standard applied, neither the UCC nor RISFA are preempted.

### 2. The OCC Regulation Does Not Preempt The UCC Or RISFA.

The OCC regulation, 12 C.F.R. § 7.4008(d) (1), provides that state laws may not "obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized non-real estate lending powers." The regulation lists certain activities that would be preempted. The list does not include default remedies in general nor repossessions in particular as among the areas preempted, and WFS does not claim that it does. Instead, WFS would have this Court read "terms of credit" so broadly as to encompass repossession protections, despite the fact that all of the examples of terms of credit in the regulation are dissimilar to repossession protections. *See 12* C.F.R. § 7.4008(d) (iv) (attached).

---

[6] Even the majority opinion endorsed in *dicta* the "significant impact" standard under *Barnett. See Watters,* 127 S. Ct. at 1567 ("States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's . . . exercise of its powers   But when state prescriptions significantly impair the exercise of authority . . . the State's regulations must give way.", citing *Barnett*).

9

WFS also cites 12 C.F.R. § 7.4008(d) (vi), which states that a national bank may make non-real estate loans without regard to state law limitations regarding "security property, including leaseholds." Although the meaning of this regulation is unclear, it appears to mean that a national bank may accept security for loans notwithstanding any state prohibitions limiting the ability to take a security interest. Nothing in the regulation suggests an intention that this provision apply to repossessions, and, as shown below, the OCC expressly excluded from the scope of the regulation those state laws that govern a national bank's ability to collect debts.

The third example of state laws that are preempted under the regulation that WFS claims includes RISFA and the UCC are those governing the disclosure and advertising of loans. *See* 12 C.F.R. § 7.4008(d) (viii). None of the examples in the regulation, however, pertain to repossession notices, but instead address documents related to the advertisement of credit and the disclosure of credit terms.

Although none of the examples of preempted laws extend to repossession statutes, the regulation includes exclusions, two of which are pertinent to this case. The regulation lists the types of state laws that are *not* preempted so long as they only incidentally affect the exercise of national banks' lending power, thus relegating them to the *Barnett* standard. *See* 12 C.F.R. § 7.4008(e). Two of those exclusions apply to the present action: "contracts" (§7.4008(e) (1)) and "rights to collect debts" (§7.4008(e) (4)).

With regard to the contract exclusion, the contracts at issue, as acknowledged by WFS at page 10 of its Memorandum, expressly incorporate the rights and creditor duties under RISFA. WFS cites *Chaires v. Chevy Chase Bank, F.S.B.*, 131 Md. App. 64 (Md. Ct. Spec. App. 2000) for the proposition that the parties may not waive preemption by means

10

of contract. The holding in that decision, although not expressly overruled, was essentially undermined by the Maryland Supreme Court in *Wells v. Chevy Chase Bank, F.S.B.,* 377 Md. 197 (2003), in which the court held that because a cardholder agreement expressly referenced Maryland commercial law, the issue became one of contract interpretation, not federal preemption. WFS's reliance upon the *Chaires* decision is accordingly misplaced.

Perhaps anticipating the inapplicability of *Chaires,* WFS argues that Plaintiff's claims are statutory rather than contractual. The Connecticut Supreme Court, however, has recognized the contractual nature of RISFA claims. In *Mack Financial Corp. v. Crossley*, 209 Conn. 163 (1988), the court imposed the statutory obligations upon a creditor in a commercial transaction, even though RISFA does not apply to commercial transactions, because of the contract's incorporation of RISFA, holding:

> In this case, the parties' bargain imposes upon the seller or its assignee the burden of complying fully with consumer procedures that would otherwise not be mandatory in this commercial context. Particularly when it is the commercial seller whose drafting has imposed this burden upon itself, we are of the view that the contract should be enforced according to its terms. The plaintiff's construction of the contract would attribute no operative meaning whatsoever to the contract's express incorporation of [RISFA]. Parties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible. We cannot say that the deliberate reference to a specific statutory section constitutes a meaningless gesture by the parties. As written, this contract's reference to [RISFA] can only be given meaningful effect by construing its notification requirements to be as mandatory for this seller and the plaintiff, its assignee, as they would be for any other financier of a consumer transaction. So construed, the contractual reference to [RISFA] makes proper notification of resale a prerequisite to the plaintiff's deficiency action. In the absence of proof of such notification, the defendants were entitled to a directed verdict.

*Id.* at 168-169 (internal quotations and citations omitted). Thus, under Connecticut law, if a secured party undertakes to comply with RISFA in its contract but fails to do so, the secured party may not recover a deficiency as a matter of contract law. Even if RISFA

did not apply to this contract, the same would be true, and the RISFA claims should not be dismissed.

Additionally, the contracts contain the following language, as required by the 16 C.F.R. § 433.2, the Federal Trade Commission's Preservation of Consumer's Claims and Defenses Rule:

> NOTICE - ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

This language provides that the Plaintiff and the class members have the same rights, defenses, and remedies against WFS that they would have against the auto dealerships, and this clause constitutes a second contractual basis for the claims.

WFS's status as an assignee of the retail installment contracts is significant, because RISFA does not apply to national banks that are engaged in direct lending activity. *See* Conn. Gen. Stat. § 36a-770(b) (7) (excludes direct loans made by national instrumentalities from the scope). The statute can apply to a national bank only when it has stepped into the shoes of a prior creditor who was not entitled to federal preemption. Plaintiff and the class members entered into contracts with auto dealerships that provided that they would enjoy the protections and rights under RISFA. These rights include the right to receive notice of the sale of their collateral, the right to redeem the collateral, and the right to have the collateral sold in a commercially reasonable manner. They should not be deprived of these rights by the happenstance that the entity that purchased their contracts was an operating subsidiary of a national bank, particularly when the OCC has

provided no consumer protections of any sort and the FTC has mandated that consumers not lose their rights following the assignment of consumer installment loans...

The OCC has also excluded from the scope of any preemption those state laws governing "the rights to collect debts." RISFA and the UCC fall within this exclusion. Both statutes govern the manner in which collateral may be repossessed and impact the right to and amount of any deficiency owed by the secured party.

Indeed, the OCC itself has opined that the UCC is **not** preempted by the regulation because it is a uniform law of general applicability on which parties rely in their daily commercial transactions. OCC, Interpretive Letter #1005 (June 10, 2004).[7] In light of the OCC's interpretation of its own regulation, it is hard to understand the basis for WFS's motion, at least with regard to the UCC claims.

The same can also be said for Plaintiff's RISFA claims. Although the OCC has not issued an interpretive letter addressing RISFA, Connecticut is not alone in enacting legislation governing installment sales contracts that apply to credit purchases of motor vehicles from auto dealerships; many states have similar statutes that emphasize consumer protections such as limitations on creditor remedies. *See e.g. Zachman v. Whirlpool Acceptance Corp.,* 841 P.l2d 27 (Wash. 1992) (discusses the purpose and origins of retail installment sales acts). These laws similarly have general applicability on which parties rely in their transactions. Under the OCC's reasoning, the RISFA claims are similarly not preempted.

---

[7] Attached and available at www.occ.treas.gov/interp/sep04/int1005.pdf

## V. CONCLUSION

For all of the foregoing reasons, the Motion to Dismiss should be denied.

**Plaintiff, FRANK D'AGOSTINO**,

By /s/Daniel S. Blinn
 Daniel S. Blinn, ct02188
 Consumer Law Group, LLC
 35 Cold Spring Road, Suite 512
 Rocky Hill, CT  06067
 860-571-0408
 860-571-7457 (fax)
 dblinn@consumerlawgroup.com

## **CERTIFICATION**

I hereby certify that on **this 29th day of May, 2007**, a copy of the foregoing **Memorandum of Law in Opposition to Motion to Dismiss** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

 /s/Daniel S. Blinn
 Daniel S. Blinn